```
0001
 1        UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT OF COLUMBIA
 3   ----------------------------------:
 4   MARILYN SEABROOKS MYRDAL,         :
 5        Plaintiff,        :
 6        vs.               : C.A. No.
 7   THE DISTRICT OF COLUMBIA, et al., : 05 CV 02351
 8        Defendants.       : (RCL)
 9   ----------------------------------:
10              Washington, D.C.
11           Monday, September 10, 2007
12   Deposition of:
13
14        PAULA SENIOR-FISHER MARSHALL
15   called for oral examination by counsel for
16   Plaintiff, pursuant to notice, at the Law Office
17   of William P. Farley, 1350 Connecticut Avenue,
18   Northwest, Suite 200, Washington, D.C., before Shari
19   R. Broussard, of Capital Reporting Company, a Notary
20   Public in and for the District of Columbia,
21   beginning at 2:45 p.m., when were present on behalf
22   of the respective parties:
0002
 1        A P P E A R A N C E S
 2   On behalf of Plaintiff:
 3      WILLIAM P. FARLEY, ESQUIRE
 4      Law Office of William P. Farley
 5      1350 Connecticut Avenue, NW, Suite 200
 6      Washington, D.C. 20036
        (202) 775-1550
 7   On behalf of the Deponent:
 8      MELVIN BOLDEN, ESQUIRE
 9      Office of the Attorney General for
          the District of Columbia
10      One Judiciary Square
        441 4th Street, Northwest
11      Suite 600 South
        Washington, D.C. 20001
12      (202) 724-5695
13   On behalf of Defendant DISTRICT OF COLUMBIA:
14      GEORGE E. RICKMAN, ESQUIRE
        Assistant Attorney General
15      Civil Litigation Division
        General Section IV
```

```
16     P.O. Box 14600
       Washington, D.C. 20044-4600
17     (202) 442-9840
18  On behalf of Defendant HAWK ONE:
19     LEONARD L. McCANTS, ESQUIRE
       McCants & Associates, L.L.C.
20     8701 Georgia Avenue, Suite 801
       Silver Spring, Maryland 20910
21     (301) 588-1850
22  ALSO PRESENT: Marilyn Seabrooks Myrdal
0003
 1          C O N T E N T S
 2  EXAMINATION BY:                    PAGE
 3    Counsel for Plaintiff             4
 4
 5
 6  SENIOR-FISHER DEPOSITION EXHIBITS:  *    PAGE
 7  1 Plaintiff's Third Notice of Deposition   9
 8  2 Unusual Incident Report                 37
 9
10
11
12
13
14
15
16
17
18
19
20     (*Exhibits attached to transcript.)
21
22
0004
 1          P R O C E E D I N G S
 2  WHEREUPON,
 3          PAULA SENIOR-FISHER MARSHALL
 4  called as a witness, and having been first duly
 5  sworn, was examined and testified as follows:
 6          EXAMINATION BY COUNSEL FOR PLAINTIFF
 7  BY MR. FARLEY:
 8    Q    Would you please state your name for the
 9  record.
10    A    Paula Senior-Fisher Marshall.
11    Q    Have you ever been deposed before?
```

12    A   No.
13    Q   And did you see a Notice of Deposition in
14  this case?
15    A   A Notice of Deposition, no.
16    Q   You've never seen a Notice of Deposition?
17    A   No.
18    Q   Did you see a Notice of Deposition in
19  July?
20    A   No.
21    Q   Do you know what a Notice of Deposition
22  is?
0005
1    A   I assume it tells you that you're going
2  to be deposed.  My lawyer called me the other day
3  and told me I was going to be deposed.
4    Q   But you've never received a Notice of
5  Deposition in this case?
6    A   No.
7    Q   And did anyone tell you you were supposed
8  to be deposed in July?
9    A   July, no.
10    Q   Did anyone say your deposition had been
11  noticed for July?
12    A   No.
13    Q   Did you ever tell anybody you couldn't be
14  deposed in July?
15    A   No.
16    Q   Were you available to be deposed in July?
17    A   July when?
18    Q   Any day in July.
19    A   You're talking about July of this year?
20    Q   Yes.
21    A   I don't know.  It depends on when it was
22  going to be.
0006
1    Q   Was there any day in July that you were
2  available for a deposition?
3    A   I -- I can't answer that question.
4    Q   Well, if you were available any day in
5  July --
6    A   I can't say that I was available any day
7  in July.
8    Q   How about in August?  Was there any day
9  in August that you were available for a deposition?
10    A   Any day in August?

```
0028
 1   to get the credit card.
 2      Q   When you said you called upstairs, who
 3   did you call to?
 4      A   I called to Ms. Lamboy's office and
 5   Ms. Cheryl Edwards' office, but they were not
 6   available.
 7      Q   And what was your position in April of
 8   2005?
 9      A   I was Interim Senior Deputy Director of
10   Health Promotion Administration.
11      Q   And was that your position when you --
12   did you retire on August 3rd?
13      A   When I retired on August 3rd, I was
14   Bureau Chief for Adult and Family Health.
15      Q   Was that a promotion?
16      A   No.
17      Q   Are they equal positions?
18      A   No, they're not.
19      Q   What's the bureau chief?
20      A   The bureau chief is subordinate to the
21   senior deputy.
22      Q   So when you called upstairs, what was
0029
 1   Ms. Lamboy's position?
 2      A   She's the chief operating officer for the
 3   department.
 4      Q   And did you report directly to her in
 5   April 2005?
 6      A   Yes.
 7      Q   Did you report to anyone else?
 8      A   I reported to her as well as Dr. Pane and
 9   Ms. Edwards, for that matter, because she was chief
10   of staff.
11      Q   And did you try to call Dr. Pane at that
12   time?
13      A   No, I didn't.
14      Q   So you just tried to call Ms. Lamboy and
15   Ms. Edwards?
16      A   Right, because they dealt -- they're the
17   ones that deal with day-to-day operations.
18      Q   Did you leave a message for Ms. Lamboy
19   and Ms. Edwards?
20      A   No, I just -- no.
21      Q   Did you talk to their secretary?
```

```
 5    Q   And what's his position today?
 6    A   I'm not sure what Kenneth is doing right
 7  now.
 8    Q   And do you know who the director of the
 9  D.C. travel card program was?
10    A   Well, Abadie was the chief contracting
11  officer for the District, so technically that
12  person is responsible for the travel card -- for
13  the credit card program.  As I said, Mr. Wong, for
14  our agency, managed both the travel card and the --
15  and the credit card for DOH.
16    Q   And did anything that you did with
17  Officer Stanley, Officer Harris, and Officer Taylor
18  in Ms. Seabrooks' office violate any District of
19  Columbia policy?
20    A   Not to my knowledge.
21    Q   And calling security for somebody taking,
22  or somebody having District of Columbia property is
0064
 1  not outside the realm of your position?
 2    A   I don't think so.
 3    Q   But it could have been outside, you could
 4  have been violating something?
 5        MR. BOLDEN:  Objection.  She's answered
 6  the question.  She said it was not.
 7  BY MR. FARLEY:
 8    Q   And who is Dr. Pane?
 9    A   Dr. Pane is the director of the program,
10  mental health.
11    Q   Is he still the director?
12    A   Yes, he is.
13    Q   Did he ever ask you anything about this
14  incident?
15    A   Did he ask me about this incident?
16    Q   Yes.
17    A   Yeah, he asked me about it later because
18  she complained to him.
19    Q   And what did he ask you?
20    A   He asked me what happened, and I told
21  him.
22    Q   And what did he say?
0065
 1    A   He didn't have that much to say about it.
 2    Q   He didn't say you violated any policy?
 3    A   No.
```

```
 4     Q   He never disciplined you in any way for
 5   this?
 6     A   No.
 7     Q   He didn't instruct you to do things
 8   differently in the future?
 9     A   No.
10     Q   So it's your understanding that he
11   thought you had done everything proper in this
12   incident?
13         MR. BOLDEN:  Objection.
14         THE WITNESS:  He --
15         MR. BOLDEN:  Objection.  You can only
16   testify as to what you know of.
17         THE WITNESS:  Right.  I received no
18   disciplinary action for this.
19   BY MR. FARLEY:
20     Q   What is your understanding that Dr. Pane
21   didn't think you did anything wrong?
22     A   I can't speak for Dr. Pane.
0066
 1     Q   I'm not asking you to.  I'm asking you
 2   your understanding.
 3     A   I received no disciplinary action from
 4   Dr. Pane.
 5     Q   Did that indicate to you that you hadn't
 6   done anything wrong?
 7     A   That's correct.  If I received no
 8   disciplinary action from him, that indicated to me
 9   that I did nothing wrong.
10     Q   Do you know Vernette Daniels?
11     A   Yes.
12     Q   Who's Vernette Daniels?
13     A   She was Ms. Seabrooks' executive
14   assistant.
15     Q   And was she in the area when this
16   incident was happening?
17     A   Her office was next door.
18     Q   Did you ever speak to her about this
19   incident?
20     A   No.
21     Q   Is there a way to tell in the District of
22   Columbia when you open e-mail?
0067
 1     A   If there's a way?
 2     Q   Yes.
```

```
 3     A   I don't -- I don't know.
 4     Q   When you opened your e-mail, did it ever
 5  say opened when you opened it or anything like
 6  that, the time?
 7     A   The time?
 8     Q   Yes.
 9     A   I guess it's on there.  I don't know.
10     Q   And do you know Kenneth Campbell?
11     A   Yes.
12     Q   Did you ever speak about this incident
13  with Kenneth Campbell?
14     A   No.
15     Q   And do you know Constance Dendy?
16     A   Yes.
17     Q   Who's Constance Dendy?
18     A   She's an employee.
19     Q   And did you ever speak about this
20  incident with Constance Dendy?
21     A   No.
22     Q   What was Ms. Dendy's position?
0068
 1     A   She's a data clerk.
 2     Q   Was her office near Ms. Seabrooks?
 3     A   No.
 4     Q   Where was her office?
 5     A   She doesn't have an office.  She has a
 6  cubicle around -- around the corner somewhere.
 7     Q   Was her cubicle near Ms. Seabrooks'
 8  office?
 9     A   Not that close to her office, no.
10     Q   And do you know Deneen Long?
11     A   Yes.
12     Q   Who is Deneen Long?
13     A   She's no longer with the department, but
14  she used to be responsible for our data unit.
15     Q   Where was her cubicle or office in
16  relationship to Ms. Seabrooks'?
17     A   Her office was a closed office all the
18  way around on the other side.
19     Q   Did you see Ms. Long when this incident
20  was happening?
21     A   I saw Ms. Long when we were coming out of
22  the office.
0069
 1     Q   And where was she?
```